UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SERGEI POTAPENKO *et al.*,<br><br>Defendant. | Case No. CR22-185RSL<br><br>ORDER ON SENTENCING |

Defendants Sergei Potapenko and Ivan Turogin entered guilty pleas in this matter on February 12, 2025. Dkts. # 159, 160. Having considered the extensive and helpful sentencing memoranda provided by defendants and the Government (Dkts. # 208, 210, 212, 214, 215, 217, 218), as well as the remainder of the record herein, the Court sentences defendants to time served and three years of supervised release for the reasons set forth below.[1]

**I.    Background**

Defendants are residents of Estonia who admitted to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Dkts. # 162, 165. Their fraud involved misrepresentations

---

[1] The reasons in this order reflect and memorialize the sentencing decision the Court issued from the bench after oral argument and statements from each defendant during defendants' sentencing hearing on August 12, 2025.

Order on Sentencing - 1

regarding their cryptocurrency mining service, HashFlare. *Id*. Specifically, defendants "caused HashFlare to represent to customers, including customers who resided and were located in the Western District of Washington, that HashFlare had cryptocurrency-mining capacity that [they] knew it lacked, and that it was performing cryptocurrency mining that [they] knew it was not." *Id*. "Defendant[s] intended, through these material misrepresentations, to deceive and cheat customers, and thereby obtain money and property through false and fraudulent pretenses." *Id*. Defendants' actions resulted in "the largest fraud ever prosecuted in the history of this District," a crime that affected 440,000 customers worldwide and brought in more than $577 million. Dkt. # 208 at 1–2, 23.

**II.     Discussion**

This is one of the most difficult sentencings the Court has encountered during 27 years on the federal bench. There is no question that the victims of defendants' fraud have been traumatically affected, as documented in letters to this Court from victims who recount the realization they had invested in a fraudulent scheme; feeling gullible and naive for having done so; feeling responsible for encouraging family and friends to invest in a fraudulent company; having to get another job or forego buying a house because of lost assets; and seeing relationships fall apart as a consequence. The victims here unquestionably suffered losses. But the Court's job is to fairly and objectively consider the legal issues and mitigating circumstances, if any, in order to come up with a just sentence for two defendants who have already been incarcerated for sixteen months in two countries as a result of their actions, and who have had their liberty restricted for three years (including more than a year of liberty

restrictions imposed by this Court as part of defendants' stringent conditions of release). Dkts. # 120, 121, 215.

In addition, while the Government and defendants diverge starkly when it comes to the recommended offense level calculation and sentencing range in this case, they are in agreement that defendants should serve out any sentence in Estonia. Dkts. # 215 at 87, 218 at 16. The mechanism for accomplishing this would be a treaty transfer to Estonia. *Id*. But if defendants were to be sentenced to a term of imprisonment by this Court and then granted a treaty transfer to Estonia by the Department of Justice's Office of International Affairs, as both the Government and defendants say they would want, there is a distinct possibility (according to defendants, a likelihood) that under Estonian law defendants would be immediately released on parole, resulting in essentially no imprisonment in Estonia. Dkts. # 215 at 87–88, 218 at 17. Were this to occur, defendants' sentence would effectively become a sentence of time served.

At the same time, because treaty transfer decisions are made by the Office of International Affairs and are not reviewable by this Court, there is also the distinct possibility (according to defendants, a strong likelihood) that defendants, after being sentenced to a term of imprisonment by this Court, would instead be denied a treaty transfer to Estonia. *See* Dkts. # 162, 165 at ¶ 20 (stating: "the transfer decision rests in the sole discretion of the Office of International Affairs ("OIA") of the Criminal Division of the United States Department of Justice . . . ."). *See also* Dkt. # 215 at 88 (stating: "The most recent statistics show that the OIA denied approximately 83% of the 1,385 transfer applications it received from foreign nationals in 2018."). If defendants were denied a treaty transfer they would, due to their lack of U.S.

Order on Sentencing - 3

citizenship, face a significantly longer and harsher term of imprisonment in this country than would American white collar criminals receiving the same sentence for the same crime. Then, after serving their prison term, defendants would be transferred to the custody of Immigration and Customs Enforcement (ICE) for indefinite detention before their eventual deportation, further lengthening their time of confinement. Dkt. # 215 at 21–23. For this reason and many others, defendants urge the Court to issue a sentence of time served.

Thus, among the many difficult choices presented by this matter, the Court is presented with this stark choice: It can either (1) sentence defendants to a term of U.S. imprisonment in the hope that defendants will receive a treaty transfer to Estonia that may result in them effectively serving a sentence of time served, all the while aware of the risk that defendants may not receive a treaty transfer and as a result would end up serving disparately long prison terms in this country; or (2) sentence defendants to time served and allow their immediate return to Estonia.

With this background established, the Court now turns to the Sentencing Guidelines and the sentencing factors set forth under 18 U.S.C. § 3553.

### A. Offense Level Calculation and Advisory Sentencing Range

There is an extreme divergence between the offense level calculations from the Government and probation, on the one hand, and defendants, on the other. The Government and probation come up with a total offense level of 42. Dkts. # 196, 199, 208 at 18. Defendants come up with a total offense level of 3. Dkt. # 215 at 34. This extreme divergence primarily traces to a disagreement over whether, given the unique financial circumstances of this case, the victims here experienced any pecuniary loss at all under relevant law (much less the

Order on Sentencing - 4

$300,000,000 loss to more than 390,000 victims described by the government). Dkts. # 208, 215, 218. The unique financial circumstances here include (1) the fact that HashFlare has already paid $352,970,000 to customers who withdrew funds; (2) the fact that HashFlare assets seized by the Government are now valued at $500 million, more than enough to compensate the roughly 240,000 HashFlare customers who never withdrew and do not now have access to their funds; and (3) an expert analysis offered by defendants showing that the HashFlare customers who did withdraw funds received at least the amount they would have in the absence of defendants' fraudulent representations regarding HashFlare's actual mining capacity. Dkts. # 208 at 14:17–19, 22:24–26; 214, Ex. A; 237 at 25:4–11. Both sides make compelling arguments in their dispute over whether there are any losses in this matter that, legally speaking, justify a "loss amount" enhancement to defendants' offender scores under U.S.S.G. § 2B1.1. Dkts. # 208, 215, 218. However, the Court ultimately agrees with the legal arguments and Sentencing Guidelines calculation proposed by the Government and U.S. Probation. Dkts. # 196, 199, 208. That calculation is as follows:

| | |
|---|---|
| Base offense level (§ 2B1.1(a)(1)) | 7 |
| Adjustment for loss amount (§ 2B1.1(O)) | +28 |
| Adjustment for number of victims (§ 2B1.1(b)(2)(B)) | +4 |
| Adjustment for foreign jurisdiction or sophisticated means (§ 2B1.1(b)(10)) | +2 |
| Adjustment for role in the offense (§ 3B1.1(a)) | +4 |
| Acceptance of responsibility (§ 3E1.1(a) & (b)) | -3 |
| | ___ |

Order on Sentencing - 5

| | |
|---|---:|
| Total Offense Level | 42 |

The Court further agrees with the Government that based upon the Total Offense Level of 42 and a Criminal History Category of I, each defendant has an advisory sentencing range of 360 months to life. Dkt. # 208 at 18. The Court notes, however, that the Government has nevertheless recommended a downward variance from that sentencing range. Dkt. # 218 at 17, 32. The Government's recommendation is that the Court sentence both defendants to ten-year (120 month) terms of imprisonment. *Id*. That recommendation is also a downward variance from what U.S. Probation noted is the statutory maximum, 240 months. Dkts. # 196 at ¶ 78, 199 at ¶ 80. *See also* 18 U.S.C. § 1343. In addition, the Government agrees with defendants that their sentences "may be adjusted downward in Estonia so that they will be immediately eligible for release on parole." *Id*.

### B. The §3553 Factors

The Court must consider a number of factors when imposing a sentence, including whether any mitigating circumstances warrant a downward variance from the sentencing range calculated under the Guidelines. 18 U.S.C. § 3553. The Court now considers those factors.

### 1. The nature and circumstances of the offense and the history and characteristics of the defendants.

As discussed above, defendants' actions resulted in "the largest fraud ever prosecuted in the history of this District," one that affected 440,000 customers and brought in more than $577 million. Dkt. # 208 at 1–2, 23. Defendants' fraud victimized individuals worldwide, some

60,000 of whom were in the United States, and caused traumatic losses and profound secondary impacts on the lives of HashFlare investors and their families.

Since their arrest, defendants have completely cooperated with the Government, even voluntarily turning over and helping the Government navigate a HashFlare database showing the victims of defendants' fraud and the amount each victim is owed. The Court finds that this action substantially helped the Government and will make the remission process easier. *See* Dkt. # 223, approving remission rather than restitution in this matter.

Defendants are non-violent, first-time offenders who have expressed remorse, have accepted responsibility for their violation of 18 U.S.C. § 1349, and have significant family support. Numerous family members wrote letters to this Court attesting to the character of each defendant. Dkts. # 212, 214. Family members also attended defendants' August 12, 2025 sentencing hearing. Dkt. # 237 at 32, 50. At the hearing, in addition to apologizing for their crimes, defendant Turogin apologized to his family members and promised not to let them down again while defendant Potapenko promised that going forward he would live honestly, support his children, and never again take his freedom for granted. *Id.* at 64:8–65:4, 65:8–67:10. The Court believes that defendants' family members will hold them to their vows.

Order on Sentencing - 7

**2. The need for the sentence to reflect "the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," "protect the public," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."**

Potapenko has serious medical issues connected to a battle with stomach cancer. Dkt. # 214. He contends that inadequate medical care in the Bureau of Prisons could prove fatal for him. Dkt. # 237 at 31:12–14. The Court shares the concerns about the adequacy of medical care provided by the Bureau of Prisons, based on multiple instances in which the Court has seen sentenced individuals not receive appropriate medical care in the federal prison system, including not receiving examinations or treatment they needed. The Court also understands that the medical system in the Bureau of Prisons is under tremendous pressure and that a lot of positions remain unfilled.

Further, the Court again notes that both the Government and defendants agree that if this Court were to impose a prison sentence, the most sensible outcome in terms of correctional treatment would be for defendants to be delivered via treaty transfer to Estonia (where Potapenko already has established medical care and treatment). *See supra*. The question for the Court thus becomes whether it can trust that the Department of Justice's Office of International Affairs would actually approve a treaty transfer. As an initial matter, the Court wishes to make clear that it has complete confidence that the U.S. Attorney's Office for the Western District of Washington always does what is right for justice and has exemplified that once again in this

Order on Sentencing - 8

case. The Court has no concerns or qualms about how this case was developed and prosecuted by the agents, investigators, and prosecutors involved, and it commends them for their hard work. But the Court has seen things coming out of the main Department of Justice that worry the Court and lead the Court to believe that it cannot rely on what have, in the past, been institutions that could be relied upon. Put simply, the Court does not know whether it should have confidence in the Department of Justice's Office of International Affairs right now. Thus, the Court feels it would be taking too great a risk by assuming that office will approve defendants' treaty transfer rather than reject it and leave defendants to serve out, as non-citizens, disparate and more dangerous sentences in U.S. prisons followed by indefinite time in ICE custody.

On this point, the Court is also influenced by an immigration appeal it recently sat on by designation for the Ninth Circuit Court of Appeals, No. 24-1018, *Johan Soto Cedeno v. Pamela Bondi*. In that matter, a temporary stay of removal was issued by the Ninth Circuit while the panel deliberated on the petition from Mr. Cedeno seeking review of an immigration judge's order that he be removed. *Id*. at Dkts. # 6, 15. Before the panel had reached a decision on the appeal, it was advised by the Government that despite the Ninth Circuit's stay of removal, Mr. Cedeno has been deported to Venezuela. *Id*. at Dkt. # 40. The explanation for this from the Government was not very satisfactory. In response, the panel—which includes Ninth Circuit Judges Ryan D. Nelson and Richard Paez—has issued an order that the Government facilitate Mr. Cedeno's return. *Id*. at Dkt. # 49. If he is not returned within 30 days, the order says, the panel will consider imposing sanctions on the Government. *Id*. This is one reason why the Court

Order on Sentencing - 9

cannot assume that the correct course will proceed under either the Department of Justice or the Bureau of Prisons in this matter.[2]

On deterrence, the Court has no concern about specific deterrence as to the two defendants here. The Court does not believe they will violate the law again. As to general deterrence, anyone who engages in fraud affecting citizens of this country should know that they will be punished severely but fairly by the American justice system.

The Government's support for sending these defendants to Estonia makes sense (and, as the Government admits, defendants could then be immediately paroled under Estonian law despite any hypothetical ten-year sentence from this Court). If sentencing in this matter were occurring some years ago, when the Court had more confidence in some of the institutions out there, the Court might sentence these defendants to ten years and feel confident that the hoped-for, non-reviewable treaty transfer would indeed occur. But as discussed above, things have been happening in federal agencies that have been of grave concern to the Court and those things make it difficult for the Court to believe that the transfer to Estonia would be as simple as the Government suggests it will be.

---

[2] The Court also notes here that the Department of Homeland Security ("DHS") sent defendants letters in April 2025 telling them to self-deport "immediately," despite both defendants being on supervised release pending sentencing from this Court. Dkt. # 175. As the Government told the Court at the time, were defendants to have followed the DHS instructions to "immediately" self-deport their compliance "would have required defendants to leave the country before being sentenced and in violation of the Court's order requiring them to remain in King County." Dkt. # 176. After outreach to DHS from the prosecution, defendants were ultimately granted "deferred action" for one year. *Id*. *See also* Dkt. # 215 at 22:10–11; 74 n.62.

Order on Sentencing - 10

### 3. The kinds of sentences available.

Both the Government and defendants agree that the idea of defendants serving out a sentence in Estonia is a good one. The Court finds it a good idea, too, but again notes its concern as to whether sentencing defendants to ten years and then hoping for a treaty transfer is the best way to achieve that outcome. The Court also notes defendants' helpful briefing on the range of options the Court may have even if defendants are sentenced to time served by this Court and then immediately return to Estonia, including the option for this Court to impose supervised release while defendants are abroad. Dkt. # 215 at 89, 100–101, 106. The Court also appreciates the assurance from defense counsel during the August 12, 2025 sentencing hearing that defendants would "certainly" follow any conditions imposed abroad. Dkt. # 237 at 58:16–17.

### 4. The sentencing range.

As discussed, the Court agrees with the Government calculations leading to a Guidelines sentencing range of 360 months to life. The Court also agrees with the Government and defendants that a major downward variance is justified here.

### 5. The need to avoid unwarranted sentence disparities among similarly situated defendants.

These are first-time, nonviolent, white-collar offenders who would be treated much more harshly in this U.S. Bureau of Prison system today than ever before, not just because they're foreign citizens but also because the Bureau of Prisons has been using private prisons and denying certain benefits to foreign defendants. On top of that, as already noted, were defendants to serve out a sentence in U.S. prison they would, due to their lack of U.S. citizenship, face a

Order on Sentencing - 11

significantly longer and harsher term of imprisonment in this country than would American white collar criminals receiving the same sentence for the same crime—and then, after serving their prison term, would be transferred to the custody of Immigration and Customs Enforcement (ICE) for indefinite detention before their eventual deportation, further lengthening their time of confinement. Dkt. # 215 at 21–23. This gravely concerns the Court.

### 6. The need to provide restitution.

The Court has no concern about the ability to provide remission in this case (*see* Dkt. #223, approving remission rather than restitution in this matter). Assets the Government seized from defendants will be used for the remission process here, and those assets are now valued at $500 million while the Government puts the loss amount to be reimbursed at $300 million. The Government has raised concerns that some portion of the seized assets in its possession are Bitcoin, which has a fluctuating value, but as defendants point out the Government could sell that Bitcoin and "lock in" the price now if the Government is concerned the price of its seized Bitcoin may soon precipitously decline.

### 7. Mitigating circumstances.

The foregoing shows that this case presents certain unique circumstances. Taking the totality of those circumstances into account, the Court finds mitigating circumstances here that justify a major downward departure from the statutory maximum of 240 months (and from the ten-year sentence sought by the Government, which itself was a major downward departure from the both the Guidelines range of 360 months to life and the statutory maximum of 240 months).

Order on Sentencing - 12

The seriousness of this crime is indisputable, but having considered the § 3553 factors the Court, under these unique circumstances, will accept the defense recommendation and impose a sentence of credit for time served. The Court will also impose three years of supervised release, which can be done remotely, as well as a special assessment of $100 and a fine of $25,000 for each defendant. In addition, each defendant shall perform 120 hours of community service per year of supervision in their neighborhoods in Estonia and provide verification to the probation office. Defendants shall have their passports returned to them upon release.

The Court agrees with the Government that it is important to send a message with this sentence, and the message the Court intends to send to fraudsters is this: "You will be punished, and the punishment will vary depending on the totality of the circumstances."

### III. Conclusion

For all the foregoing reasons, the Court sentences defendants to time served and three years supervised release with all conditions as set forth in the Judgment. Defendants shall complete 120 hours of community service per year of supervision. Defendants shall also pay a $100 special assessment and a $25,000 fine. Defendants' passports shall be returned to them upon release.

IT IS SO ORDERED.

DATED this 25th day of August, 2025.

Order on Sentencing - 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*MRS Lasnik*
Robert S. Lasnik
United States District Judge

Order on Sentencing - 14